**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**HOT SPRINGS DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 6:19-CR-60001-001** |
| | ) | |
| **JAMES VIGIL** | ) | |

**UNITED STATES' RESPONSE TO DEFENDANT'S**
**MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR**
**CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY**

Comes now the United States of America, by and through Kimberly D. Harris, Interim United States Attorney for the Western District of Arkansas, and for its Response to Defendant's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, states:

**BACKGROUND**

On August 16, 2019, the Defendant, James Vigil was named in a two-count Superseding Indictment charging him two counts of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1), 922(g)(3), and 924(a)(2). (Doc. 34).

On December 5, 2019, after a three-day jury trial, Vigil was convicted on Count One and acquitted as to Count Two of the Superseding Indictment. (Docs. 56, 59, 60, and 62).

Vigil's initial Presentence Investigation Report ("PSR") was filed on February 3, 2020. (Doc. 70). The initial PSR set Vigil's base offense level at 24 but added 4 levels for him using or possessing a firearm or ammunition in connection with another felony offense. (Doc. 70, ¶¶ 23 and 24). The initial PSR determined Vigil was an armed career criminal pursuant to U.S.S.G. § 4B1.4(a). (Doc. 70, ¶ 29). Defense counsel made eight objections to the PSR including objecting to application of the armed career criminal enhancement, that his total offense level should be 24

1

with a guidelines range of 92-115 months, and that he should not have received three points for his aggravated vehicle burglary conviction such that his criminal history score should have been 11 with a criminal history category of V. (Doc. 73).

A final PSR was filed on March 10, 2020. (Doc. 75). Vigil's base offense level was 24 but was increased by 4 levels for using or possessing a firearm or ammunition in connection with another felony offense thereby resulting in an adjusted offense level of 28. (Doc. 75, ¶¶ 23, 24, and 28). However, the final PSR determined Vigil to be an armed career criminal which set his total offense level at 34. (Doc. 75, ¶¶ 29 and 31). Vigil's criminal history score amounted to 12, but because he committed his instant offense while under a criminal justice sentence, two points were added which established a criminal history score of 14 and a criminal history category of VI. (Doc. 75, ¶¶ 41 – 44). However, because Vigil was determined to be an armed career criminal, his criminal history category is VI. (Doc. 75, ¶ 44). The final PSR determined Vigil faced a minimum of 15 years and a maximum of life imprisonment. (Doc. 75, ¶ 75). His guideline provisions called for an imprisonment range of 262 to 327 months. (Doc. 75, ¶ 76).

Again, defense counsel filed objections contending certain offenses did not qualify as predicate convictions, that his correct base offense level should have been 20, that his criminal history category should have been V, and that he has only one prior conviction that counts as a felony conviction. (Doc. 82).

On April 30, 2020, Vigil's counsel filed a sentencing memorandum in which counsel argued Vigil did not have three qualifying prior felonies to subject him to being sentenced as an armed career criminal under 18 U.S.C. § 924(e), that his base offense level should have been 20, that he should not have received a four point enhancement for using or possessing a firearm or

ammunition in connection with another felony offense, and that should the Court overrule his objections then a downward variance would be necessary. (Doc. 83).

On July 16, 2024, Vigil appeared before this Court for sentencing. (Doc. 86). At sentencing, the Court determined that the offense listed in paragraph 34 was not a qualifying offense for armed career criminal status and, as a result, his statutory maximum sentence was 120 months. ((Doc. 89, ¶ I.B.3.; Doc. 98, pp. 15 – 17). The Court recognized that Vigil's offense level was 28 with a criminal history category VI which established a guideline range of 140 to 175 months imprisonment but because his statutory maximum sentence was 120 months his guideline range was 120 months. (Doc. 98, p. 21). The Court proceeded to sentence Vigil to 120 months imprisonment. (Doc. 88; Doc. 98, pp. 33 – 35).

Vigil filed a timely notice of appeal. (Doc. 90). On appeal, Vigil's counsel filed a brief under *Anders v. California*, 386 U.S. 738 (1967), challenging the sufficiency of the evidence supporting the verdict, and arguing that the court erred in calculating the Guidelines range. *United States v. Vigil*, No. 24-2560, 2025 WL 1275777, at *1 (8th Cir. May 2, 2025) (unpublished). Vigil filed a *pro se* brief where among other issues he questioned federal jurisdiction and argued that his counsel failed to file a motion to suppress based on a stalking horse violation. Supplemental/Letter Brief filed by Appellant James Vigil at 3, *United States v. Vigil*, No. 24-2560 (8th Cir. Jan. 22, 2025). The Eighth Circuit concluded there was sufficient evidence to support Vigil's conviction, that this Court did not commit reversible error with respect to calculating his applicable Guidelines range, and that that Vigil's additional arguments raised in his *pro se* brief did not warrant vacating his conviction or sentence. *Vigil*, 2025 WL 1275777, at *1.

On February 17, 2026, Vigil filed the instant *pro se* Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (the "2255 Motion"). (Doc. 105). The Court ordered the United States to provide its response by April 13, 2026. (Doc. 108).

## DISCUSSION

Under 28 U.S.C. § 2255, "[a] prisoner in custody under sentence ... claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). The court may grant the motion if it finds "that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement on the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack." 28 U.S.C. § 2255(b).

In his § 2255 Motion, Vigil claims:

1) the United States committed prosecutorial misconduct;

2) the Court lacked jurisdiction due to no federal nexus;

3) counsel failed to communicate with him, failed to file a motion to suppress as to the alleged pretextual probation search, and failed to inform him of the relevant circumstances and likely consequences of pleading guilty as opposed to proceeding to trial;

4) counsel failed to inform him of his trial strategy and theory of defense along with claims of issues that counsel either failed to pursue or challenge;

4

5)       counsel failed to discuss and explain the PSR, failed to file substantive objections to the PSR, failed to argue for mitigation of punishment, failed to object to his sentence being substantively unreasonable, and failed to preserve meritorious issues for appeal.

## I.   Vigil's Non-Ineffective Assistance Claim, Prosecutorial Misconduct, Is Procedurally Defaulted

The principle that claims not raised on direct appeal are defaulted in habeas proceedings prevents circumvention of the direct appeal process.  A motion pursuant to § 2255 "may not do service for an appeal." *United States v. Frady*, 456 U.S. 152, 165 (1982) ("[W]e have long and consistently affirmed that a collateral challenge may not do service for an appeal.").  Relief under § 2255 "is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and, if uncorrected, would result in a complete miscarriage of justice." *United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir.1996).  Habeas review is "an extraordinary remedy and will not be allowed to do service for an appeal." *Bousley v. United States*, 118 S. Ct. 1604, 1610 (1998) (internal quotation marks and citation omitted); *see also*, *e.g.*, *Regalado v. United States*, 334 F.3d 520, 528 (6th Cir.2003) ("Section 2255 is not a substitute for a direct appeal, and thus a defendant cannot use it to circumvent the direct appeal process.").  The distinction between direct appeal and collateral attack stems from the importance of the finality of judgments. *See Bousley*, 523 U.S. at 621 (internal quotation marks and citation omitted) ("[T]he concern with finality served with the limitation on collateral attack has special force with respect to convictions based on guilty pleas."); *see also Frady*, 456 U.S. at 164-65.

The failure to raise an issue on direct appeal ordinarily constitutes a procedural default and precludes a defendant's ability to raise that issue for the first time in a § 2255 motion. *Dejan v. United States*, 208 F.3d 682, 685 (8th Cir.2000); *Swedzinski v. United States*, 160 F.3d 498, 500 (8th Cir.1998); *Matthews v. United States*, 114 F.3d 112, 113 (8th Cir.1997).  This rule applies

5

whether the conviction was obtained through trial or through the entry of a guilty plea. *E.g.*, *United States v. Cain*, 134 F.3d 1345, 1352 (8th Cir.1998). "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either cause and actual prejudice, or that he is actually innocent." *Lindsey v. United States*, 615 F.3d 998, 1000 (8th Cir.2010) (*quoting Bousley v. United States*, 523 U.S. 614, 622 (1998)). "'[C]ause' in the formula 'cause and prejudice' means some impediment to making an argument" at the time of the direct appeal. *Turner v. United States*, 693 F.3d 756, 758 (2012); *Cf. McCleskey v. Zant*, 499 U.S. 467, 497 (1991) (in successive writ cause and prejudice analysis "[f]or cause to exist, the external impediment, whether it be government interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim").

Here, Vigil has not suggested any external impediment that prevented him from presenting his claim on direct appeal. Because a federal court need not consider the prejudice exception if the cause component has not been met, Vigil cannot rely upon this exception to overcome the procedural default. *Ashker v. Class*, 152 F.3d 863, 871 (8th Cir.1998) (when petitioner "has not shown adequate cause to overcome the procedural bar ... we need not consider the issue of actual prejudice"). Furthermore, Vigil fails to demonstrate a miscarriage of justice through actual innocence. "Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." *Schlup v. Delo*, 513 U.S. 298, 316 (1995). Thus, in this case, Vigil simply failed to raise his current non-ineffective assistance of counsel claim on direct appeal, and he is unable to satisfy the "cause and prejudice"

standard or demonstrate actual innocence.  Therefore, his claim has been procedurally defaulted and should be dismissed.

Even if the Court were to consider Vigil's defaulted claim, then, as discussed below, the Court should find his prosecutorial misconduct claim to be without merit.

## II.    No Prosecutorial Misconduct Occurred

Under his first ground for relief, Vigil cites to *Napue v. Illinois*, 360 U.S. 264 (1959), and *Giglio v. United States*, 405 U.S. 150 (1972), to support his argument that the United States knowingly presented, relied upon, and failed to correct false and misleading testimony and impressions concerning the circumstances of his arrest and the legality of Officer Weaver's conduct. Courts presume "that [prosecutors] have properly discharged their official duties." *United States v. Armstrong*, 517 U.S. 456, 464 (1992).  It is well-recognized that, as a general rule, prosecutorial misconduct does not merit federal habeas relief unless the misconduct "so infected the [proceedings] with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (*quoting Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

In *Giglio*, the Supreme Court held that prosecutors may not permit testimony they know to be false to stand uncorrected, if "the false testimony could ... in any reasonable likelihood have affected the judgment of the jury." 405 U.S. at 154, (*quoting Napue* 360 U.S. at 271). A *Napue* violation occurs when the government "knowingly submit[s] perjured testimony to the jury." *United States v. Ruzicka*, 988 F.3d 997, 1003 (8th Cir.2021) To establish a due-process violation under *Napue*, Vigil "must show that the prosecution knowingly solicited false testimony or knowingly allowed it 'to go uncorrected when it appear[ed].'" *Glossip v. Oklahoma*, 604 U.S. 226, 246 (2025) (*quoting Napue*, 360 U.S. at 269).

Here Vigil claims that the United States relied upon a false narrative that his arrest resulted from a routine probation "home check" rather than the fact that the Officer Weaver was acting in coordination with law enforcement on a narcotics investigation called Operation White Horse. Vigil's claim is incorrect.  Vigil ignores the fact that this information was elicited through cross-examination.

BY MR. PIERCE:

Q. Mr. Weaver, as I understand it, you and three other officers went on this home visit on October 16, 2018?

A. Yes; that's correct.

Q. Who were the other three gentlemen?

A. It's Officer Tyler Ward and Agent Brandon Emerson and Agent Adam Wilson.

Q. Did each of you prepare and file a -- prepare a report as a result of your incident?

A. No, sir.

Q. Why not?

A. We had one 80R.

Q. I beg your pardon?

A. We have one arrest report because --

Q. So, well, who -- Okay. I've been given a copy of a report that says facts constituting probable cause and has looks like JW's initial and maybe a GW. May I approach, Your Honor?

THE COURT: Yes.

A. Yes. That's my initials there.

Q. Okay. And do you know whose these initials are here?

A. I'm not sure.

Q. Okay. All right. So have you prepared a report?

A. Yes.

Q. The one you that you have right there in front of you, I have a copy. So let's talk a little about that, right?

A. Yes.

Q. So it's my understanding none of the other officers prepared a report. They just all adopted yours?

A. Yes, sir.

Q. Now, you indicated a moment ago that you got -- you had received information about drug activity occurring in this home?

A. Yes, sir.

Q. What was that information?

A. We were working with another operation with the Drug Task Force that week, and they advised us that there was potential drug activity in Mr. Vigil's home.

Q. Was that Operation White Horse?

A. It was.

Q. That's the one that made all the news, right?

A. Yes, sir.

Q. I believe I saw on the news feed with Mr. Dak Keyes standing in the background, your local prosecutor standing in the foreground bragging about all of these people who were arrested, that's the same White Horse we are talking about, is that right?

A. I believe so; yes, sir.

Q. And when you went to the specific information, I mean, what was it? Just vague, something's going on at this place, check it out. I mean, what was said?

A. We received information from the Drug Task Force that they had possible drug activity in their home. I didn't get the information directly. It came through a different officer.

Q. You who did it come through?

9

A. It came through the Drug Task Force.

Q. Which officer? There's many officers in the Drug Task Force.

A. I don't recall.

Q. Did the Drug Task Force eventually show up at the scene?

THE COURT: They did.

Q. Who were they?

A. Investigator Wilhite, there was I believe three of them. Investigator Kluesner, and I believe, I can't remember his last name right off the top of my head.

Q. I understand it's been awhile. If you need to refresh your memory by looking at your report, you're welcome to do so. Do you need a minute?

A. (Pause) In this report, it just lists investigators with the 18th Drug Task Force.

Q. Okay. So you just went along for the ride. Somebody else told -- had this information, and did you-all just kind of had a little group meeting and decide to go over there?

A. We were all working different things that week. We were split up into different groups throughout the week, so, yes, sir.

(Doc. 101, pp. 206 – 209).

Vigil further claims the false narrative was further exposed by the testimony of his assigned probation supervisor, Officer Hines, who stated she was not informed of, involved in, or aware of any probation violation or enforcement action against him.

Q. . . .Now, were you actually the supervisor to Mr. Vigil? Were you actually the person who went to his home visits and things of that nature?

A. Yes, sir.

Q. Did you go to the home visit on October 16th?

A. No, sir.

Q. Why not?

A. I do not remember why, to be honest with you, I don't --

Q. Okay.

A. I was in the process of transferring to Saline County.

Q. Is that where you are now?

A. Yes, sir.

Q. Okay. Well, now, my impression is that there was some kind of a suggestion of drug activity going on in the house, and so you -- the probation office went above and beyond and made a surprise home visit on October 16th, is that right?

A. It was not me, sir.

Q. So you don't know anything about what caused that home visit to occur?

A. No, sir. I was not in, I was not involved in that.

(Doc. 101, p. 189).

It's clear from the record that the cases which hold that it is prosecutorial misconduct for the United States to acquiesce in perjured testimony are not applicable here and, as a result, Vigil's claim does not meet the test for prosecutorial use of perjured testimony discussed in *Giglio* and *Napue*. Simply, Vigil has presented no evidence that the prosecution intentionally elicited false testimony or misled the jury. Officer Weaver specifically testified that the reason for the home visit was because the Drug Task Force advised him there was potential drug activity in Vigil's home and confirmed that it was a part of Operation White Horse. Officer Hines testified that she did not go to the home visit and did not know anything about what caused the home visit to occur because she was in the process of transferring to Saline County. As such, the issue Vigil complains of was developed on cross-examination and fully disclosed to the jury. Under these circumstances, there is no "corruption of the truth-seeking function of the trial process" because the defense was

11

able to explore the circumstances of Vigil's arrest on cross-examination. *United States v. Bagley*, 473 U.S. 667, 680 (1985).

Moreover, Vigil has not proven that the Officer's testimony may have had an effect on the outcome of his trial.  This is because Vigil's argument stems from his belief that the United States used a false narrative to get around the prohibition on "stalking horse" searches. However, when a probationer is subject to a search term or conditions, a warrantless search of a probationer's house requires no more than reasonable suspicion to conduct the search because a probationer has a "significantly diminished privacy interest." *United States v. Knights*, 534 U.S. 112, 121–22 (2001). The reasonableness of a search is determined "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999). The Supreme Court held in *Knights* that a defendant's status as a probationer subject to a search condition informs both sides of the balancing test because probation is a form of criminal sanction with a continuum of possible punishments that justify curtailing their individual freedoms, in contrast with free and law-abiding citizens who enjoy an "absolute liberty." *Knights*, 534 U.S. 112 at 118–19.

The Eighth Circuit, in the wake of the ruling in *Knights*, holds that probation officers working with law enforcement and task force officers cannot be "stalking horses" for probationary searches of residences. *United States v. Brown*, 346 F.3d 808, 810 (8th Cir.2003). Specifically, the Eighth Circuit in *Brown*, following the Supreme Court's analysis in *Knights*, held that a probationer's status on probation with a search condition diminished the individual privacy interest and expectation of privacy on that side of the balancing test. The Eighth Circuit further held that the government's legitimate interest was increased on the other side of the balancing test because

12

the "'very assumption of the institution of probation' is that the probationer 'is more likely than the ordinary citizen to violate the law,'" (*quoting Griffin v. Wisconsin*, 483 U.S. 868, 880 (1987)). *Id*. The Eighth Circuit then went one step further and concluded that the Supreme Court in *Knights* held and intended that stalking horse and official purpose analysis, along with any claims about the actual motivations of probation officers, are not to be applied to these types of searches. *Id*. at 812.

Here, Vigil relies on outdated case law for his claim, and the current case law standards leave him with no grounds for his claim. He had a diminished privacy interest as a defendant on probation. This lowers the standard for warrantless searches of his residence to a reasonable suspicion standard. While on supervision Vigil failed multiple drug tests and probation had received information that there was possible drug activity at his residence. Under the legal precedent provided, Vigil cannot prevail on his claim that the United States presented, relied upon, and failed to correct false and misleading testimony and impressions concerning the circumstances of his arrest and the legality of Officer Weaver's conduct. His probation condition and the circumstances of the search leading to his arrest are entirely in keeping with searches that have been upheld already by the Eighth Circuit and the Supreme Court.

## III.    A Federal Nexus Existed for this Court to Have Federal Jurisdiction

Vigil next argues that this Court lacked jurisdiction because the investigation and arrest were conducted by state authorities. The fact that the Arkansas State Drug Task Force was the authority that first investigated and arrested Vigil does not defeat federal jurisdiction. The sovereign that first arrests a defendant has primary jurisdiction, but a state may elect under the doctrine of comity to relinquish primary jurisdiction to the United States. *United States v. Dowdle*, 217 F.3d 610, 611 (8th Cir.2000). Moreover, it is not uncommon for state and federal laws to

13

overlap, and prosecution by multiple sovereigns does not violate rights under the Constitution. *See Heath v. Alabama*, 474 U.S. 82 (1985) ("When a defendant in a single act violates the 'peace and dignity' of two sovereigns by breaking the laws of each, he has committed two distinct 'offences.'" (*quoting United States v. Lanza*, 260 U.S. 377, 382 (1922)). Here, Vigil has not cited any controlling legal authority and there is nothing in the record to indicate that this Court did not have proper jurisdiction over his case.

Vigil's violation of an offense against the United States gave this Court original jurisdiction over his case. "[T]he federal government ha[s] an interest, independent of any state interest, to ensure that an individual who is believed to have violated a federal statute is prosecuted for that violation." *United States v. Talley*, 16 F.3d 972, 974 (8th Cir.1994). "The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States." 18 U.S.C. § 3231. Here, Counts One and Two of the Superseding Indictment charged Vigil with possession a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1), which, in pertinent part, states:

> (g) It shall be unlawful for any person—
>
> > (1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;
> >
> > to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

In *Scarborough v. United States*, the Supreme Court held that under 18 U.S.C. § 922(g)(1), proof that the possessed firearm previously traveled at some time in interstate commerce is sufficient to satisfy the required nexus between possession and commerce. 431 U.S. 563, 573 (1977). In *United States v. Perkins*, the Eighth Circuit addressed the nexus requirement, finding

that "the relationship of the gun to interstate commerce needs to be only minimal." 633 F.2d 856, 859 (8th Cir.1981). The Eighth Circuit has found that proof that the firearm was manufactured outside the state of possession establishes the required nexus between possession and commerce. *United States v. Cox*, 942 F.2d 1282, 1286 (8th Cir.1991).

In this case, on January 31, 2019, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives, examined the firearms found during the search of Vigil's residence. (*See* Doc. 87, ¶ 16; Doc. 102, pp. 42 – 44). The Agent found the firearms to be firearms as defined in 18 U.S.C. § 921(a)(3) (The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.). (*Id.*).  The Agent further found the firearms functioned as designed, that they were not manufactured in Arkansas, and had traveled in or affected interstate commerce. (*Id.*). Thus, the record in Vigil's criminal case clearly shows that the United States met the minimal nexus requirement in 18 U.S.C. § 922(g)(1), and that, therefore, this Court had jurisdiction over Counts One and Two.

## IV.    Counsel's Performance Was Not Constitutionally Deficient

### A.    Legal Standards for Section 2255 Relief

To prevail on a claim of ineffective assistance of counsel, Vigil must show that his attorney's performance was "deficient," and that the deficient performance was "prejudicial." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To establish ineffective assistance of counsel within the context of section 2255, however, a movant faces a heavy burden.  *United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir.1996).  The burden of proving ineffective assistance of counsel is on the defendant.  *United States v. Cronic*, 466 U.S. 648, 658 (1984); *United States v. White*,

15

341 F.3d 673, 678 (8th Cir.2003).  As the Eighth Circuit Court of Appeals has explained, "'The applicable law here is well-established: post-conviction relief will not be granted on a claim of ineffective assistance of trial counsel unless the petitioner can show not only that counsel's performance was deficient but also that such deficient performance prejudiced his defense.'" *United States v. Ledezma-Rodriguez*, 423 F.3d 830, 836 (8th Cir.2005) (*quoting Saunders v. United States*, 236 F.3d 950, 952 (8th Cir.2001), in turn *citing Strickland v. Washington*, 466 U.S. 668, 687 (1984)); *Davis v. Norris*, 423 F.3d 868, 877 (8th Cir.2005) ("To prove that his counsel rendered ineffective assistance in violation of the Sixth Amendment, [the movant] must satisfy the two prong test outlined in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)," which requires the movant to "show that his counsel's performance was deficient" and that he was "prejudice[d]").

The "deficient performance" prong requires the movant to "show that his 'counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *United States v. Rice*, 449 F.3d 887, 897 (8th Cir.2006) (*quoting Strickland*, 466 U.S. at 687).  That showing can be made by demonstrating counsel's performance "fell below an objective standard of reasonableness." *Wiggins v. Smith,* 539 U.S. 510, 522 (2003) (*quoting Strickland*, 466 U.S. at 688).  However, there are two substantial impediments to making such a showing.  First, "[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Rice*, 449 F.3d at 897 (*quoting Strickland*, 466 U.S. at 690).  Second, "[t]here is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* (*quoting Strickland*, 466 U.S. at 689); *Davis*, 423 F.3d at 877 ("To satisfy this prong [the movant] must overcome the strong presumption that his counsel's conduct fell within the wide range of reasonable professional

assistance."). Court's also "do not use hindsight to question counsel's performance," but instead analyze it according to counsel's situation at the time of the allegedly incompetent act or omission. *Kenley v. Armontrout*, 937 F.2d 1298, 1303 (8th Cir.1991). If the movant fails to show deficient performance by counsel, the court need proceed no further in its analysis of an "ineffective assistance" claim. *United States v. Walker*, 324 F.3d 1032, 1040 (8th Cir.2003).

Even if counsel's performance was "deficient," the movant must also establish "prejudice" to overcome the presumption of reasonable professional assistance. *Ledezma- Rodriguez*, 423 F.3d at 836; *Davis*, 423 F.3d at 877. One claiming ineffective counsel faces an uphill battle proving prejudice. "Petitioner bears a heavy burden of proving that prejudice resulted from alleged ineffective assistance of counsel." *Eldridge v. Atkins*, 665 F.2d 228, 232 (8th Cir.1981). Mere speculation is an insufficient showing of prejudice. Instead, a defendant must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Garrett v. United States*, 78 F.3d 1296, 1301 (8th Cir.1996) (*citing Strickland*, 466 U.S. at 689). To satisfy this "prejudice" prong, the movant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different ... [,] a reasonable probability [meaning] a probability sufficient to undermine confidence in the outcome." *Rice*, 449 F.3d at 897 (*quoting Strickland*, 466 U.S. at 694); *Davis*, 423 F.3d at 877 (same). Thus, "[I]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Pfau v. Ault*, 409 F.3d 933, 939 (8th Cir.2005) (*quoting Strickland*, 466 U.S. at 693). The United States Supreme Court has clarified the "prejudice" analysis to be applied in ineffective assistance of counsel cases as it has explained:

> [A]n analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or

17

> unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him.

*Lockhart v. Fretwell*, 506 U.S. 364, 369-70 (1993) (footnote omitted). The Supreme Court specified that the proper prejudice analysis is whether "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. Because counsel is presumed to be effective, *Cox v. Wyrick*, 642 F.2d 222, 226 (8th Cir.1981), *cert. denied* 451 U.S. 1021 (1981), the movant bears a heavy burden in proving that counsel has rendered ineffective assistance. *Howard v. Wyrick*, 720 F.2d 993, 995 (8th Cir.1983), *cert. denied* 466 U.S. 930 (1984). *See also Sidebottom v. Delo*, 54 F.3d 1357, 1365 (8th Cir.1995).

Although the two prongs of the "ineffective assistance" analysis are described as sequential, courts are not bound by mechanistic rules in evaluating ineffective assistance claims. *Boysiewick v. Schriro*, 179 F.3d 616, 620 (8th Cir.1999) ("do not ... need to address the performance prong if petitioner does not affirmatively prove prejudice."). Thus, the court need not determine whether a defendant's counsel acted reasonably, if a defendant has failed to show prejudice, as lack of prejudice can be dispositive. *United States v. DeRoo*, 223 F.3d 919, 925 (8th Cir.2000), *citing Apfel*, 97 F.3d at 1076. If it is easier to dispose of an ineffectiveness claim for lack of sufficient prejudice, the court should do so. *Strickland*, 466 U.S. at 697; *Whitehead v. Dormire*, 340 F.3d 532, 537 (8th Cir.2003).

**B.    Communicate / Motion to Suppress / Independent Investigation / Plea Agreement**

Under his first ground for relief based on ineffective assistance, Vigil claims counsel failed to communicate with him, failed to file a motion to suppress as to the alleged pretextual probation search, and failed to inform him of the relevant circumstances and likely consequences of pleading guilty as opposed to proceeding to trial.

18

### 1.      Vigil's Lack of Communication Claim is Conclusory

Vigil broadly asserts that his counsel failed to communicate with him. He asserts that counsel only met with him approximately once per month with meetings only lasting 20 – 30 minutes. He further asserts that although counsel accepted phone calls from him, substantive strategic discussions were minimal. Vigil appears to place the blame for this as, "[n]otably, this matter constituted [counsel's] first jury trial."[1] Vigil fails, however, to specifically allege what information he was denied or allege how more information would have remedied any prejudice to his defense. As such, Vigil has failed to adequately assert how he satisfies the deficiency and prejudice prongs of the *Strickland* test, and this general claim is without merit. *See Hollis v. United States*, 796 F.2d 1043, 1046 (8th Cir.1986) (vague and conclusory allegations are insufficient to state a ground for relief under 28 U.S.C. § 2255); *Smith v. United States*, 677 F.2d 39, 41 (8th Cir. 1982) (conclusory allegations, unsupported by any specifics, are subject to summary dismissal); *Bryson v. United States*, 268 F.3d 560, 562 (8th Cir. 2001) (brief, conclusory allegations that failed to cite to the record insufficient to support claims of ineffective assistance of counsel).

### 2.      No Basis for Counsel to File a Motion to Suppress

Vigil complains that counsel failed to file a motion to suppress based on the warrantless entry, search, detention, and arrest arising from Officer Weaver's conduct. Vigil's claim rests on his argument that counsel should have challenged the pretextual search based on the "stalking horse" theory. However, as discussed above, Vigil's "stalking horse" claim is meritless. *See Brown*, 346 F.3d at 811 ("And when [the Supreme Court in *Knights*] rejected any challenge based on the 'actual motivations' of the officers, the Court confirmed that the Fourth Amendment does

---

[1] An ineffective assistance claim cannot be based solely on counsel's inexperience. *See United States v. Cronic*, 466 U.S. 648, 665 (1984) ("The character of a particular lawyer's experience may shed light in an evaluation of his actual performance, but it does not justify a presumption of ineffectiveness in the absence of such an evaluation.").

not require a stalking horse inquiry." (citation omitted). According to Vigil's own argument, when he expressly requested that counsel file a motion to suppress based on a "stalking horse" theory, counsel handed him a printed copy of the *Knights* decision and informed Vigil that such a motion would be frivolous. (*See* Doc. 105, p. 21). Thus, it is clear that counsel investigated the case law and determined there was no basis for filing the motion to suppress.  As discussed above, counsel was not wrong in his determination to not advance a meritless motion.

There was, therefore, no basis for the filing of a motion to suppress based on a "stalking horse" theory and counsel cannot be ineffective for failing to file a meritless motion. *See Rodriguez v. United States*, 17 F.3d 225, 226 (8th Cir.1994) ("[C]ounsel's failure to advance a meritless argument cannot constitute ineffective assistance."). As a result, this claim should be denied.

### 3.     Vigil Fails to Allege Specific Information to Support His Claim that Counsel Failed to Seek Independent Investigative Resources

Additionally, Vigil faults counsel for failing to request funds for a private investigator to help challenge the United States' case claiming this prejudiced him by depriving him of a viable defense and leaving the government's case uncontested. As Vigil points out, pursuant to *Strickland*, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691. In assessing counsel's reasonableness, the court must consider "whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith,* 539 U.S. 510, 527 (2003). "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691.

To prevail on a claim of lack of investigation, Vigil must allege what specific information counsel failed to discover, that a reasonable investigation would have disclosed that information,

20

and that the information would have aided him or improved his position. *Barnett v. Roper*, 904 F.3d 623, 631 (8th Cir.2018); *Strickland*, 466 U.S. at 691. Here, Vigil, does not indicate what facts or circumstances needed investigation. Vigil only offers a broad sweeping conclusory allegation unsupported by specifics. The claim raised by Vigil must go beyond a mere allegation. "The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal. . ." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977); *Voytik v. United States*, 778 F.2d 1306, 1308 (8th Cir.1985); *see also Carpenter v. United States*, 720 F.2d 546, 548 (8th Cir.1983) (conclusory allegations are insufficient to rebut the presumption of competency granted to defense counsel). Here, Vigil advances no authority or meaningful arguments to support his ground for relief. Rather, Vigil broadly states to the effect that counsel failed to file a motion requesting funds for a private investigator which deprived him of a viable defense. Such a self-serving and unsubstantiated claim is not enough to undermine confidence in the outcome of the trial, as required by *Strickland*.

Assuming Vigil's claim goes to his "stalking horse" theory argument, then obviously, as discussed previously, counsel made a reasonable decision that made such an investigation unnecessary.

### 4.    Plea Agreement

While "there is no constitutional right to plea bargain," *Weatherford v. Bursey*, 429 U.S. 545, 561 (1977), "as a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused," and failing to do so may constitute ineffective assistance of counsel. Frye, 566 U.S. at 145. "The Sixth Amendment right to effective assistance of counsel includes representation during the plea bargaining process." *Mayfield v. United States*, 955 F.3d 707, 711 (8th Cir.2020) (*citing*

*Missouri v. Frye*, 566 U.S. 134, 143-47 (2012)).  "If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it." *Id*. (*quoting Lafler v. Cooper*, 566 U.S. 156, 168 (2012)). "[A]s a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Frye*, 566 U.S. at 145. The failure to communicate a formal plea offer before it expires satisfies *Strickland's* "deficient performance" prong. *Id.* at 147. But Strickland also requires prejudice, and "[t]o show prejudice from ineffective assistance of counsel where a plea offer has lapsed ..., [a] defendant[ ] must demonstrate a reasonable probability [he] would have accepted the earlier plea offer." *Id*.  That is, Vigil "must present some credible, nonconclusory evidence that he would have pleaded guilty had he been ... advised of a potential plea agreement." *United States v. Petters,* 986 F. Supp. 2d 1077, 1088 (D.Minn. 2013) (Kyle, J.) (*quoting Engelen v. United States*, 68 F.3d 238, 241 (8th Cir.1995).

In this case, it appears Vigil had no intention of pleading guilty.  According to counsel, counsel received a plea agreement from the United States on March 7, 2019, and on June 18, 2019, Vigil informed counsel that he would not be pleading guilty. Again, on July 18, 2019, counsel meet with Vigil to go over the plea offer and Vigil informed counsel he had no intention of pleading guilty and wanted to proceed to trial.  (*Id*.). Thus, as Vigil's self-serving claim is contradicted in this case, he fails to present credible, nonconclusory evidence that he would have pleaded guilty had he been advised of a plea agreement.

Assuming arguendo that Vigil's counsel did not provide any plea negotiations from the United States nor attempt to deal with the prosecutor on his behalf, he would still not be entitled to relief. According to Vigil, he was deprived of the substantial benefits a negotiated plea could have provided, including reduced charges, lower sentencing ranges, or preservation of key

22

defenses. However, Vigil cannot show "prejudice" under *Strickland*, as he has failed to "demonstrate a reasonable probability [he] would have accepted the ... offer" and pleaded guilty. *Frye*, 566 U.S. at 147. Nowhere in Vigil's § 2255 motion does he admit his guilt. Nowhere does he state affirmatively that he would have pleaded guilty had counsel told him about a plea offer and explained the ramifications of accepting that offer versus going to trial. All Vigil offers is an allegation that counsel failed to attempt to negotiate a favorable plea agreement.  He has not made the required showing to prove prejudice for a missed opportunity to accept a plea offer because he has not shown that he would have accepted the plea offer had counsel performed effectively.

Even if a habeas petitioner shows prejudice, the remedy is to order the government to reoffer the plea agreement. *Lafler*, 566 U.S. at 175. If the habeas petitioner accepts the plea offer, the trial court has the discretion to: (1) vacate the trial convictions and resentence the petitioner pursuant to the plea agreement, (2) vacate only some of the trial convictions and resentence the petitioner accordingly, or (3) leave the trial convictions and corresponding sentences undisturbed. *Id*.

### C.    Trial Strategy / Neglected Issues

Vigil further claims counsel failed to inform him of his trial strategy and theory of defense along with claims of issues that counsel either failed to pursue or challenge.

#### 1.    Vigil Fails to Articulate How Counsel Failed to Explain Trial Strategy and Theory of Defense

Under this ground for relief, Vigil first contends his counsel never provided him with a clear explanation of trial strategy or how his counsel intended to challenge the United States' case. While Vigil asserts that counsel could have outlined the plan for challenging jurisdiction, evidence, procedural defects, and advising him regarding a plea agreement, Vigil does not articulate how

23

counsel's performance was deficient, or how he was prejudiced by that performance in that there would have been a different outcome. General and conclusory allegations are insufficient to support a claim for ineffective assistance of counsel. *See Hill v. Lockhart*, 474 U.S. 52, 57–59 (1985); *Estes v. United States*, 883 F.2d 645, 647 (8th Cir.1989) (conclusory allegation was insufficient to rebut strong presumption of counsel's competence); *United States v. Goodman*, 590 F.2d 705, 711 (8th Cir.1979) (holding that conclusory allegations unsupported by specific facts may be summarily dismissed).

### 2.     No Merit to Challenge Warrantless Search

Vigil complains that counsel could have challenged the warrantless entry by Officer Weaver, which would have demonstrated that his arrest was conducted without a valid, signed warrant and outside the bounds of legal authority. This is incorrect.

Counsel exercised sound judgment by not challenging the warrantless entry. This is because Vigil fails to appreciate that he had signed a valid Arkansas Community Correction Warrantless Search Waiver. The Search Waiver applied under Ark. Code Ann. § 16-93-106, as signed by Vigil, states:

> As a condition of my supervised parole or probation, I agree to allow any Arkansas Community Correction officer, or any certified law enforcement officer, to conduct a warrantless search of my person, place of residence, or motor vehicle at any time, day or night, whenever requested by the Arkansas Community Correction officer or certified law enforcement officer. I understand that a warrantless search based on this waiver must be conducted in a reasonable manner but *does not need to be based on a clearly expressed suspicion that I am committing or I have committed a criminal crime.*

(*See* Gov. Ex. 1) [emphasis added]. The Eighth Circuit has upheld probationary searches. For example, in *United States v. Brown*, officers, based on an informant's tip, believed Brown was selling drugs. 346 F.3d 808, 810 (8th Cir.2003). Officers searched Brown's home without a warrant, seeking drugs, which they found. *Id*. Applying Fourth

24

Amendment analysis, the Court found that the officers had reasonable suspicion, and therefore despite the fact that they were in fact investigating allegations of new crimes, the challenge to the search was denied. *Id*. at 813-14. In so reaching this holding, the Eighth Circuit recognized that when *Knights* "rejected any challenge based on the 'actual motivations' of the officers, the Court confirmed that the Fourth Amendment does not require a stalking horse inquiry." *Id*. at 812.

Additionally, the United States Supreme Court has upheld the same type of search waiver that Vigil agreed to as a condition of parole. In *Samson v. California*, the Supreme Court held that a suspicionless search of a parolee does not violate his Fourth Amendment rights where the applicable statute permits such searches. *Samson v. California*, 547 U.S. 843, 852 (2006). The Arkansas Court of Appeals recently addressed the Arkansas search waiver statute and recognized that the statute was valid under the holding of *Samson*:

> The Court in *Samson* considered all the facts of the case in context, including (1) the specific provisions of the authorizing statute; (2) the great state interest in reducing recidivism; (3) the fact that the petitioner was serving an active prison sentence, that he was given the choice to either remain incarcerated until the end of his sentence or agree to certain terms of parole and serve the remainder of his sentence outside of prison; and (4) by choosing parole, he knowingly and purposefully accepted its conditions. The Court held that the petitioner's reasonable expectation of privacy, for the purpose of his Fourth Amendment challenge, was severely diminished based on the facts and context of his case and that the Fourth Amendment does not per se "prohibit a police officer from conducting a suspicionless search of a parolee" if the parolee has accepted a specific condition of parole, authorized by statute, that requires the parolee to submit to warrantless searches. Id. at 857. In other words, the Court upheld suspicionless searches of parolees pursuant to a state statute allowing for such searches.

*Clingmon v. State*, 2021 Ark. App. 107 (2021) (upholding validity of Ark. Code Ann. § 16-93-106 and observing that "*Samson* made clear that the Fourth Amendment does not per se 'prohibit a police officer from conducting a suspicionless search of a parolee' if the

25

parolee has accepted a specific condition of parole, authorized by statute, that requires the parolee to submit to warrantless searches. (*quoting Samson* at 857)).

Further, the Arkansas Court of Appeals denied that a parolee is coerced into signing a search waiver upon his release from prison, finding "[h]e freely and voluntarily signed the waiver with full knowledge of its conditions." *Clingmon*, 2021 Ark. App. 107. Defendants are free to serve the remainder of their sentences in prison. Thus, under *Brown*, *Samson,* and under Ark. Code. Ann. § 16-93-106, Vigil's argument that officers searched property beyond the scope of any probation condition is simply inaccurate as a matter of law. The officers' search of Vigil's residence was thus justified under *Brown*, *Samson,* and Ark. Code. Ann. § 16-93-106.

Because Vigil had a valid warrantless Waiver, counsel's failure or refusal to file a meritless motion does not support an ineffective assistance claim. *Rodriguez v. United States*, 17 F.3d 225, 226 (8th Cir.1994) (per curium) (holding that "counsel's failure to advance a meritless argument cannot constitute ineffective assistance"); *Aguirre v. United States*, No. CIV 13-1007, 2013 WL 1702034, at *1 (D.S.D. Apr. 18, 2013) (holding that a "failure to file a frivolous motion to suppress can never constitute ineffective assistance of counsel.").

### 3.   No Merit to Challenge Federal Jurisdiction

Vigil again complains that counsel should have challenged the legitimacy of federal jurisdiction. However, as discussed above in Section III, a federal nexus existed for this Court to have federal jurisdiction. As a result, counsel exercised good legal judgment in not challenging jurisdiction.

26

4.    **Vigil Fails to Show Prejudice Due to Counsel's Alleged Failure to Challenge Admission of Evidence**

Vigil argues that counsel should have challenged the admission of evidence stemming from an illegal search.  In support of his argument, Vigil claims officers misidentified themselves during testimony, provided inconsistent accounts of where the firearm and other items were found, and failed to document who handled the evidence. According to Vigil, these chain-of-custody errors raised substantial questions regarding the reliability and admissibility of the firearm as evidence.

Officer Scott Kluesner testified as to his involvement in the collection of evidence and chain of custody. (Doc. 101, pp. 227 – 268). Officer Kluesner affirmed that his involvement in this case was to collect the evidence, package it, and get it sent to the State Crime Lab. (Doc. 101, p. 254). On cross-examination, counsel was able to elicit from Officer Kluesner that another investigator from the 18th East Drug Task Force, Paul Pruitt, transported the items to the crime lab and that the firearm was collectively taken into evidence. (Doc. 101, pp. 256 - 257).

Vigils alleges counsel's failure to object or pursue suppression prejudiced his defense because there was a reasonable probability that the jury would have viewed the firearm evidence with skepticism or the Court might have suppressed the evidence entirely. As discussed above, to establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The burden is on Vigil. *Cronic*, 466 U.S. at 658; *United States v. White*, 341 F.3d 673, 678 (8th Cir.2003).

Vigil does not articulate how an objection would have kept the evidence from being admitted. He also does not articulate any misconduct. That he disagrees with the procedure used does not mean there was misconduct that changed the nature of the evidence. Vigil makes no

allegation that the evidence was tampered with. Vigil has failed to meet the prejudice prong under *Strickland*. Vigil has not met his burden

or even articulated how there is a substantial likelihood that, if an objection had been raised at trial, the outcome of the trial would have changed. Vigil cannot show there is a "reasonable probability" that there is a "substantial" likelihood the result would have been different even if the Court would have granted an unnamed objection.

### 5.    DNA/Fingerprint Testing Fell Under Trial Strategy

Vigil complains that counsel could have requested DNA and fingerprint testing on the firearm to determine whether he actually handled it. Vigil alleges such testing could have confirmed or refuted the United States' theory of possession and allowed counsel to cross-examine the officers regarding the accuracy of their testimony. According to Vigil, this prejudiced his defense because such testing could have weakened the United States' case or strengthen grounds for suppression or plea negotiations. Counsel did address Vigil's concern at trial, and his actions were not deficient.

The United States argues that counsel's choice not to request DNA or fingerprint testing on the firearm was one of trial strategy. For example, firearms are notoriously difficult to retrieve fingerprints from. Published studies suggest that prints can be obtained from firearms approximately 10% to 15% of the time. Evidence regarding the absence of prints and the like, 7 Jones on Evidence § 59:20 (7th ed.). So, whether the firearm would have provided useable fingerprints was problematic.

The Supreme Court made clear in *Strickland*, that it is not the role of the court to second guess strategy decisions of trial counsel. 466 U.S. at 689; *see Williams v. United States*, 452 F.3d 1009, 1013 (8th Cir.2006) (The court does not "second-guess" trial strategy or rely on the benefit

of hindsight.). Counsel addressed Vigil's concern at trial by attacking the government's failure to analyze the firearm for DNA or fingerprints. Counsel cross-examined Officer Kluesner about whether DNA or fingerprints were collected in an attempt to cast doubt that the firearm was not possessed by Vigil:

Q. Okay. How did these items that went to the crime lab get to the crime lab?

A. They were transported there by another investigator with 18 East Drug Task Force.

Q. Who?

A. Another investigator that works with the 18th East Drug Task Force transported them.

Q. Does this investigator with the 18th East District Task Force have a name?

A. Drug Task Force. Yes, he does. Paul Pruitt.

Q. Okay. Thank you. Tell me, you collected DNA?

A. No, sir.

Q. Collected fingerprints?

A. No, sir.

Q. Did you take the firearm into evidence?

A. The firearm was taken into evidence.

Q. Did you take it into evidence?

A. Not me personally; no, sir.

Q. Okay. Did you collect it and bag it and tag it?

A. Collectively, yes, we did.

Q. Okay. Well, who fingerprinted it?

A. It's not been fingerprinted to my knowledge.

Q. Well, who took the DNA off of it?

A. There was no DNA taken, to my knowledge.

Q. What about each of the ammunitions? There's four silver shells and three brass casing shells; who examined them and took the DNA off of those?

A. I don't believe anybody took any DNA off of any ammo.

Q. Who took fingerprints off the ammo?

A. I don't think that was done either.

Q. In part of your job as being collector of the evidence, do you have the ability to make the request of the crime lab to examine DNA?

A. I suppose it's possible; yes.

Q. Do you have the ability, same question, the ability to have the crime lab examine fingerprints?

A. Yes, sir.

Q. And you have fingerprint samples of Mr. Vigil, do you not?

A. I don't.

Q. Well, but the agency does, do they not?

A. The Drug Task Force?

Q. Yes, sir.

A. Not to my knowledge.

Q. They have access to it?

A. We would have access to them; yes.

Q. Okay. So you would have something, a known sample to compare it to?

A. Probably; yes, sir.

Q. Okay. But that wasn't done?

A. No, sir.

30

Q. All right. And I guess the same question, and I hate to sound like I'm being silly, but I have to ask. No DNA or fingerprints were taken off any of these samples that we've been collecting and talking about, right?

A. You mean like taking DNA or fingerprints off baggies and syringes?

Q. Yes, sir.

A. No, sir.

Q. That wasn't done. Or the scales?

A. No, sir.

(Doc. 101, pp. 256 – 258). Counsel brought the point up before the Court in its motion for a judgment of acquittal.

> Your Honor, under Rule 29, we don't believe that the government's made its case. It can't show that Mr. Vigil possessed either one of these weapons. I think the testimony has been pretty clear that, although there's a lot of supposition, there's really nothing that ties him to either one of these guns. No fingerprints. There's no DNA or anything like that. He doesn't have -- there's no photographs of him possessing the gun. He just happens to walk in after there's a search of his home, and then we have this young lady who testified that a weapon was found after he was already in custody, so there's no way he could have constructively possessed either one of these weapons.

(Doc. 102, p. 165). And drove the point further on during closing arguments before the jury.

> Agent Kluesner testified that none of the things in the house, including the gun and the lock box, were tested for DNA or fingerprints. Even though he admitted that they had those resources available to them and access to James Vigil's fingerprints, if he wanted them, to compare if any would have been found. Why weren't they taken? Agent Danner testified today that he didn't feel it was necessary to run a trace on this firearm. Now, the phrase "didn't feel it was necessary" makes me think that, well, it could have been done. He just chose not to. He's stopped his investigation when he made up his mind.

(Doc. 102, pp. 328 – 329).

This strategy can only be questioned in light of the guilty verdict. With this hindsight, any defendant might choose a different option. But the choice not to analyze the firearm for DNA or

31

fingerprints fit with the trial strategy chosen by counsel; that the United States could not prove his guilt beyond a reasonable doubt. Vigil's counsel was not ineffective merely because the strategy didn't work. Reasonable strategic decisions are virtually unchallengeable in a Section 2255 Petition. *Strickland*, 466 U.S. at 690. Vigil cannot overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Id*. at 689. Thus, Vigil is unable to overcome the "strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Id*.

### 6.    No Basis to Investigate Officer Weaver's Conduct

As explained under Section II, Officer Weaver's conduct was not unlawful so there was no basis for counsel to investigate his credibility.

### 7.    No Basis to Challenge Statements Referring to Drug Use

Finally, under this ground for relief, Vigil argues counsel failed to challenge the United States' statements and evidence related to drugs. Vigil claims the introduction of these statements and evidence amounted to uncharged bad acts that prejudiced the jury and undermined his right to a fair trial. This claim is without merit.

Vigil fails to appreciate that he was charged with being an unlawful user of a controlled substance in possession of a firearm in violation of 18 U.S.C.§§ 922(g)(1), (g)(3), and 924(a)(2). Title 18, United States Code, Section 922(g)(3) provides in relevant part:

> (g) It shall be unlawful for any person—
>
>> (3) who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802));
>
> to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(3). To sustain a conviction, the United States was required to demonstrate that Vigil used a controlled substance 'during the period of time' that he possessed firearms. *United States v. Carnes*, 22 F.4th 743, 749 (8th Cir.2022). The United States was allowed to submit relevant proof of drug use in support of its charges.

In any event, a review of trial transcript reveals that counsel did challenge the United States' ability to present evidence of Vigil being a drug user.

> THE COURT: Okay, okay. Because originally we were thinking that the focus was going to be just on the gun, but you're going to be presenting evidence that he may be a drug user.

> MR. HARRIS: Yes, there is alternative ways of interpreting that statute.

> THE COURT: Right. So you're going to do both.

> MR. HARRIS: Yes.

> THE COURT: Okay, okay. Try to keep them as separated as you can so my jury doesn't get confused and I don't have 10,000 notes after they go back into, you know, try -- Okay.

> MR. HARRIS: I will try.

\* \* \*

> MR. PIERCE: Your Honor, I have a question about though. Since we are stipulating about the element that he knows, first of all, that he has the prior felony and what have you to satisfy Rehaif, I'm not even sure we need to get into the drug part because that element is because they are in the alternative, it's already proven, so the government doesn't have to prove anything beyond on that element. And I'm just wondering what the prejudice is going to be to the client if we go into much drug use, and the jury, the very same reason that the Court's thinking about, well, you know, to keep them separated, I mean, I don't see why we even need to go there, if
> we have already stipulated under Ochief [sic] that he is a prohibited person or he had knowledge of being a prohibited person.

> THE COURT: David?

> MR. HARRIS: Are you going to stipulate that he's also a user.

33

MR. PIERCE: I don't need to. I have already –

MR. HARRIS: I mean we can't stipulate our case away. So, I mean, you can't, hey, here is how you are going to introduce this. I mean, the way he's charged, he's charged as both, so even though they are alternative theories, we have got to put on evidence of that, unless he stipulates to I'm also an unlawful user.

MR. PIERCE: Well, Judge, we will forgive you on that one.

MR. WYNN: We disagree. I mean, the Judge just said she doesn't want them in the back arguing about either or or, do I have to convict him because he is a felon and because he is a drug user or one or the other? We are saying that it's a non-issue. We stipulated he's a felon. Let's move on to the next element.

THE COURT: You can't –

MR. HARRIS: It still comes in as part of -- it's the whole res gestae of the case. That's why they are there is because of drug activity. It's certainly no more prejudicial than him being a felon. I mean, so I don't understand the argument.

THE COURT: Yeah. I mean, you really can't stipulate their case away. I mean, you know, you can stipulate, they have got the right to, to prove their case however they want to prove it. I mean, you can't stipulate --

MR. PIERCE: I understand that, Your Honor, but it just seems to me it's kind of a waste of time since we have already stipulated to the elements necessary to get the conviction on that part. I mean, I think the things, the two things left to fight about is did he knowingly possess a firearm, and, number two, did the firearm travel in interstate commerce, did it affect interstate commerce? I think the other two elements are already proven by the stipulation. It seems like to me it's just kind of piling on. I just don't see how it's necessary. Obviously, they can try it the way they want to, and they charged it the way they want to, but I would just kind of like to see if it, if we are going to have to go there, which I personally object to, but if we have to go there, I would like to keep it to a minimum, because otherwise it's going to turn out to be a drug trial.

THE COURT: Yeah, yeah. I mean, I'm going to let them go because that is the way this thing is charged. He wasn't charged with just being a felon in possession of a firearm. He was charged with both of them. And so I'm going to let them go there. How they do their case is, you know, that's the government's decision, you know. Okay?

(Doc. 101, pp. 25 – 28). Thus, the record contradicts Vigil's claim that counsel failed to challenge

the United States' introduction of statements and evidence as to drug use. Just because counsel

was unsuccessful in his arguments, does not mean he was ineffective. *James v. Iowa*, 100 F.3d 586, 590 (8th Cir.1996) (Counsel is not ineffective simply because his arguments ultimately are unsuccessful.).

**D.   PSR / Mitigation of Punishment / Substantively Unreasonable Sentence / Appeal**

Further, Vigil argues counsel failed to discuss and explain the PSR to him, file substantive objections to the PSR, argue for mitigation of punishment, object to his sentence being substantively unreasonable, and preserve issues for appeal. As discussed below, each claim is without merit.

**1.   The Record Indicates Counsel Discussed and Reviewed Vigil's PSR with Him**

Vigil next claims that his sentencing counsel failed to review or explain the PSR's findings with him. The record of Vigil's sentencing hearing undermines his claim.

At sentencing the following colloquy occurred:

> THE COURT: . . . On December 5th, 2019, the jury found you guilty of being a felon in possession of a firearm as charged in County [sic] One of this superseding indictment and found you not guilty for being a felon in possession of a firearm as charged in Count Two of this superseding indictment. A judgment of acquittal dismissing Count Two was then entered by the Court. A presentence report was ordered, and you were remanded back to the custody of the United States marshal ending trial.
>
> Now, I have received a copy of that presentence report. The original report was dated February 3rd, 2020, and it was revised on March 10th, 2020.
>
> The government filed no objections to this presentence report. There were originally eight objections filed by your attorney and then one additional objection was filed sometime later.
>
> Mr. Wynn, have you seen that presentence report and gone over it with your client?
>
> MR. WYNN: I have, Your Honor.

35

> THE COURT: Okay. Mr. Vigil, have you seen that - - did Mr. Wynn go over that report with you?
>
> THE DEFENDANT:  Yes, ma'am.
>
> THE COURT: Do you have any questions about it?
>
> THE DEFENDANT:  No, ma'am.

(Doc. 98, pp. 9 – 10). Because Vigil cannot now contradict his statements made to the Court at sentencing, his ineffective assistance of counsel claim fails.

## 2.    The Record Indicates Vigil's Counsel Made Objections to the PSR

Vigil claims his counsel failed to file substantive objections to the PSR. Specifically, Vigil claims counsel failed to challenge the armed career criminal enhancement and the enhancement he received under U.S.S.G. § 2K2.1(b)(6)(B).  A review of the record refutes Vigil's claims.

First, as to counsel's failure to challenge the ACCA enhancement, the record shows that after the initial PSR was filed (Doc. 70), counsel filed objections including, "Objection No. 3: Page 5, Paragraphs 17, 29 & 44. Mr. Vigil objects to the application of the armed career criminal enhancement and maintains he does not have three qualifying predicate convictions. The Chapter Four Enhancement does not apply." (*See* Doc. 73).  Indeed, counsel not only filed an objection to application of the armed career criminal enhancement, counsel successfully challenged application of the armed career criminal enhancement which resulted in lowering his statutory maximum from life to 120 months.   (*See* Doc. 89, ¶ I.B.3.; Doc. 98, pp. 13 – 18).

Second, as to Vigil's claim that counsel failed to challenge the 2K2.1(b)(6)(B) firearm enhancement, the record contradicts his assertion.  Again, after the initial PSR was filed, counsel filed the following objection:

> Objection No. 4: Page 6, Paragraph 24, 28, 29 and 44. Mr. Vigil did not possess any firearm or ammunition in connection with either a crime of violence or a controlled substance offense. As defined in USSG 4B1.2(b), a controlled substance

36

offense requires more than mere possession of a controlled substance. Based on the crime lab analysis from Paragraph 14, there were only personal use amounts of drugs found in the residence. There is no evidence that Mr. Vigil was selling the narcotics found in the residence, in fact the used syringes and smoking pipes, in conjunction with small amounts of drugs and bags containing residue, tend to show that Mr. Vigil was not selling any of the narcotics found. Mr. Vigil did not possess any firearm or ammunition in connection with another felony offense, he is not an armed career criminal, and therefore the Adjusted Offense Level should be 24.

(Doc. 73). At sentencing the Court took up Vigil's objection. (Doc. 98, pp. 18 – 20). After determining that this was not a simple possession but rather a trafficking case where the firearm was in close proximity to the drugs and drug paraphernalia, the Court determined the four-level enhancement under 2K2.1(b)(6)(B) was appropriately applied. (Doc. 98, p. 20). The fact that counsel's objection proved unsuccessful does not mean that he was ineffective. *See James v. Iowa*, 100 F.3d 586, 590 (8th Cir. 1996) (counsel is not ineffective simply because his arguments ultimately are unsuccessful).

### 3.   Counsel Advocated for Mitigation of Punishment

Vigil next claims counsel failed to argue for mitigation of punishment by arguing counsel deprived him of an opportunity for a downward variance by failing to bring forth that he had a clean probation record, consistently complied with all conditions, and never tested positive for prohibited substances during supervised release. The record again belies Vigil's claim.

On April 30, 2020, counsel filed a sentencing memorandum in which he argued that a 63-month sentence was appropriate, but if the Court found otherwise, then a downward variance would be sufficient. (Doc. 83). Additionally, counsel made oral arguments at sentencing to support the request and submitted several letters of support. (Doc. 98, pp. 25 – 31). Thus, as the record contradicts Vigil's argument regarding ineffective assistance of counsel for failing to argue for mitigation of punishment, his claim is without merit.

### 4.    No Justification to Object to Vigil's Sentence

Vigil claims his counsel failed to object to his sentence being substantively unreasonable. Vigil claims had counsel objected, there was a reasonable probability that the Court would have imposed a lower sentence. The United States disagrees.

The substantive reasonable of a sentence is reviewed under an abuse of discretion standard. *United States v. Armond*, 135 F.4th 626, 628 (8th Cir.2025). This "narrow and deferential" review means that only an "unusual case" will warrant a finding of substantive unreasonableness. *United States v. Shuler*, 598 F.3d 444, 447 (8th Cir.2010) (*quoting United States v. Feemster*, 572 F.3d 455, 464 (8th Cir.2009) (en banc)). Under this deferential standard, "[a] district court abuses its discretion when it (1) fails to consider a relevant factor that should have received significant weight; (2) gives significant weight to an improper or irrelevant factor; or (3) considers only the appropriate factors but in weighing those factors commits a clear error of judgment." *United States v. Holmes*, 137 F.4th 734, 743 (8th Cir.2025) (citation omitted). It is presumed that a sentence within the Guidelines' recommended range is reasonable. *United States v. Goodhouse*, 81 F.4th 786, 793 (8th Cir.2023).

Here, Vigil appears to argue that counsel should have objected to the Court not placing enough weight to his conduct, prior record, and demonstrated rehabilitation. The Court in this case heard extensive argument from Vigil's counsel concerning his conduct, prior record, and rehabilitation. (Doc. 83; Doc. 98, pp. 25 – 31). However, the Court determined that him possessing a gun at the same time as drugs, his extensive criminal history involving violence and drugs, the need to deter him and protect the public, him knowing he was a felon and was not supposed to possess firearms, and the need to provide him with educational, vocational training, and medical care justified a within guideline 120-month sentence. (Doc. 98, pp. 33 – 36). Vigil may disagree

38

with the lack of weight the Court gave to his history and circumstances and believes counsel should have offered an objection based on that, but, as counsel would be aware, a disagreement over the amount of weight a court should give mitigating factors does not warrant reversal of a within-Guidelines sentence. *United States v. Hollow Horn Bear*, 144 F.4th 1105, 1110-11, (8th Cir.2025). Additionally, counsel would be aware that sentencing courts have wide latitude to weigh the § 3553(a) factors in each case and may assign some factors greater weight than others in determining an appropriate sentence. *United States v. Runner*, 135 F.4th 618, 622 (8th Cir.2025). As a result, Vigil is unable to demonstrate that counsel performed ineffectively by failing to object to his sentence and he fails to demonstrate that had counsel objected the Court would have imposed a lesser sentence. Especially as the Court noted, "that despite the objections made by the defendant whether they were granted or denied, I would impose this same sentence of 120 months based upon my considerations of the 3553 criteria and all the facts and circumstances of this case." (Doc. 98, pp. 35 – 35).

### 5.    Vigil Fails to Demonstrate an Appeal Would Have been Successful

Finally, Vigil claims counsel rendered ineffective assistance by failing to provide meaningful communication or consultation regarding the issues he wished to raise on appeal. As discussed below, the Court should dismiss Vigil's claim.

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel, including effective assistance on direct appeal. *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985); *Strickland*, 466 U.S. at 687. However, while Vigil had the right to decide whether to appeal, he did not have the right to decide what points to raise on appeal. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983) ("Neither *Anders* nor any other decision of this Court suggests, however, that the indigent defendant has a constitutional right to compel appointed counsel to press nonfrivolous

points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points."). Review of appellate counsel's performance is "particularly deferential" where, as here, a defendant argues "counsel failed to raise an additional issue on direct appeal." *Charboneau v. United States*, 702 F.3d 1132, 1136 (8th Cir.2013).

Claims of ineffective assistance of appellate counsel are generally assessed under the same two-part *Strickland* deficiency and prejudice standard as claims of ineffective assistance of trial counsel. *Roe v. Flores–Ortega*, 528 U.S. 470, 476–87 (2000). The deficient performance standard is rigorous. On appeal, appellate counsel is expected to winnow the issues and highlight those issues that are most likely to prevail. *See Jones* 463 U.S. at 751 ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal."); *Gee v. Groose*, 110 F.3d 1346 (8th Cir.1997) ("Reasonable appellate strategy requires an attorney to limit the appeal to those issues counsel determines have the highest likelihood of success."); *Otey v. Grammar*, 859 F.2d 575 (8th Cir.1987) ("This process of 'winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy.'"). "It is the obligation of any lawyer - whether privately retained or publicly appointed - not to clog the courts with frivolous . . . appeals." *Polk County v. Dodson*, 454 U.S. 312, 323 (1981); *Parker v. Bowersox*, 94 F.3d 458, 462 (8th Cir.1996) ("To perform competently under the Sixth Amendment, counsel is neither required nor even advised to raise every conceivable issue on appeal."). Therefore, "absent contrary evidence," a court assumes that when appellate counsel does not raise a claim, it was "an exercise of sound appellate strategy." *United States v. Brown*, 528 F.3d 1030, 1033 (8th Cir.2008) (*quoting Roe v. Delo*, 160 F.3d 416, 418 (8th Cir.1998)).

The prejudice standard is equally rigorous. Vigil must show that "the result of the proceeding would have been different" had appellate counsel raised the issues on direct appeal. *Becht*, 403 F.3d at 546. Furthermore, a court need not determine the objective reasonableness of appellate counsel's conduct before examining the prejudice suffered by the petitioner as a result of counsel's alleged failures. *Strickland*, 466 U.S. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.*

Noticeably absent from Vigil's claim are any references to the possible arguments appellate counsel could have raised on appeal that would have been meritorious. Here, Vigil only offers conclusory allegations without facts or authority. The claims raised by Vigil under this ground for relief must go beyond mere allegations. "The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal. . ." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977); *Voytik v. United States*, 778 F.2d 1306, 1308 (8th Cir.1985); *see also Carpenter v. United States*, 720 F.2d 546, 548 (8th Cir.1983) (conclusory allegations are insufficient to rebut the presumption of competency granted to defense counsel).

Here, Vigil claims that appellate counsel provided ineffective assistance by effectively abandoning issues related to 1) the illegality of the warrantless arrest, 2) Officer Weaver's misconduct and misrepresentations, 3) the admission of irrelevant or prejudicial evidence, 4) chain-of-custody violations, 5) lack of DNA/fingerprint testing on the firearm, 6) lack of federal jurisdiction, and 6) sentencing enhancement errors. According to Vigil, if counsel did not abandon these claims, then there is a reasonable probability that one or more of the issues would have resulted in reversal, remand, or a reduction of his sentence. Vigil, however, fails to provide factual support and fails to advance any authority or meaningful argument to support his conclusion.

41

Rather, he offers only unsupported self-serving, conclusory allegations that his counsel abandoned certain issues. As a result, Vigil has not met his burden of showing that counsel failed to raise meritorious issues on appeal. That is Vigil has presented no arguments to demonstrate that had counsel raised these issues he would have prevailed on appeal. Therefore, because Vigil fails to show that the result of the proceeding would have been different had appellate counsel raised the issues on direct appeal, his claim should be dismissed. *Becht*, 403 F.3d at 546.

## VI.   No Evidentiary Hearing Is Required and No Certificate of Appealability Should Issue

Title 28, U.S.C. § 2255 provides in pertinent part:

> Unless the motion and the files and records of the case conclusively show that the prisoner is not entitled to relief, the court shall . . . grant a prompt hearing thereon.

28 U.S.C. § 2255(b).

Rule 4(b) of the Rules Governing Section 2255 Proceedings for the United States District Court states:

> The judge who receives the motion must promptly examine it. If it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion and direct the clerk to notify the moving party. . .

The Eighth Circuit Court of Appeals has explained,

> "Evidentiary hearings on 28 U.S.C. § 2255 motions are preferred, and the general rule is that a hearing is necessary prior to the motion's disposition if a factual dispute exists." [*Thomas v. United States*, 737 F.3d 1202, 1206 (8th Cir.2013)]. "The district court is not permitted to make a credibility determination on the affidavits alone." *Id*. at 1206.

*United States v. Sellner*, 773 F.3d 927, 929 (8th Cir.2014). Indeed, "[w]here petitioner's allegations, if true, amount to ineffective assistance of counsel, a hearing must be held unless the

record 'affirmatively refutes the factual assertions upon which [the claim] is based.'" *Franco v. United States*, 762 F.3d 761, 763 (8th Cir.2014) (*citing Watson v. United States*, 493 F.3d 960, 964 (8th Cir.2007), *in turn quoting Shaw v. United States*, 24 F.3d 1040, 1043 (8th Cir.1994)). On the other hand,

> [The district court] may ... deny an evidentiary hearing if "(1) the [petitioner's] allegations, accepted as true, would not entitle the [petitioner] to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." [*Thomas*, 737 F.3d] at 1206–07 (alterations in original) (*quoting Buster v. United States,* 447 F.3d 1130, 1132 (8th Cir.2006)).

*Sellner*, 773 F.3d at 929-930; *accord Anderson v. United States*, 762 F.3d 787, 792 (8th Cir.2014) (*citing* 28 U.S.C. § 2255(b)); *Franco*, 762 F.3d at 763; *Winters v. United States*, 716 F.3d 1098, 1103 (8th Cir.2013). The district court's denial of an evidentiary hearing is reviewed for abuse of discretion. *Sellner*, 773 F.3d at 929; *see also United States v. Frausto*, 754 F.3d 640, 642 (8th Cir. 2014) (explaining that, to determine whether the district court abused its discretion in denying an evidentiary hearing, the court must review *de novo* the validity of a petitioner's § 2255 claims).

Here, an evidentiary hearing is both unwarranted and unnecessary as the issues raised by Vigil in his § 2255 Motion are resolvable by reviewing the record.  As discussed above; after reviewing Vigil's claims against the record and applicable law, his asserted facts do not support cognizable claims for relief.  Thus, an evidentiary hearing is unnecessary.

When the district court has denied a motion under 28 U.S.C. § 2255, the movant may not appeal without a certificate of appealability.  Such a certificate may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2). A "substantial showing" under this section is a showing that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*,

529 U.S. 473, 484 (2000).  In other words, a "substantial showing" is made if "a court could resolve the issues differently, or the issues deserve further proceedings."  *Cox v. Norris*, 133 F.3d 565, 569 (8th Cir.1997).  In this case, as demonstrated above, Vigil has not made a substantial showing of the denial of a constitutional right.  Accordingly, this Court should deny any request for a certificate of appealability.

## CONCLUSION

Based on the foregoing arguments and authority, the United States respectfully requests that Vigil's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody be ***DENIED*** and requests the Court deny any motion by Vigil for a certificate of appealability for his failure to make a substantial showing that he was denied a constitutional right pursuant to 28 U.S.C. § 2253(c)(2).

Respectfully submitted,

KIMBERLY D. HARRIS
INTERIM UNITED STATES ATTORNEY

By:   /s/ David A. Harris
David A. Harris
Assistant United States Attorney
Arkansas Bar No. 2003104
414 Parker Avenue
Fort Smith, Arkansas 72901
Phone: 479-783-5125
E-mail: david.a.harris@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I, David A. Harris, Assistant U.S. Attorney for the Western District of Arkansas, hereby certify that on April 13, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing and I hereby certify that I have mailed the document by United States Postal Service to the following non CM/ECF participants:

James Vigil
Register No. 15295-010
FCI Terre Haute
Federal Correctional Institution
P.O. Box 33
Terre Haute, IN   47808

/s/ David A. Harris
David A. Harris
Assistant U.S. Attorney

45